In the Matter of the Application of the TRANSIT COMMISSION, Being the Metropolitan Division of the Department of Public Service, Petitioner, and THE CITY OF NEW YORK, Intervenor, Petitioner, against THE LONG ISLAND RAILROAD COMPANY, THE STATEN ISLAND RAPID TRANSIT RAILWAY COMPANY and THE NEW YORK CENTRAL RAILROAD COMPANY, Respondents.

Supreme Court, Trial Term, New York County, March 6, 1942.

*George H. Stover, Counsel to the Transit Commission* [*Philip Hodes* and *Harry Scheiner* of counsel], for the petitioner.

*William C. Chanler, Corporation Counsel* [*Herman Horowitz* and *Murray Sendler* of counsel], for the intervenor, petitioner.

*John J. Bennett, Jr., Attorney-General* [*Howard F. R. Mulligan* and *Joseph Mafera* of counsel], for the State of New York.

*Louis J. Carruthers*, for The Long Island Railroad Company, respondent.

*Cravath, de Gersdorff, Swaine & Wood*, for The Staten Island Rapid Transit Railway Company, respondent.

*Clive C. Handy* [*Martin Conboy, Frederick H. Wood* and *Jacob Aronson* of counsel], for the New York Central Railroad Company, respondent.

HOFSTADTER, J. This is a special proceeding commenced by the Transit Commission, as petitioner, and the City of New York, as intervening petitioner, against The Long Island Railroad Company, The Staten Island Rapid Transit Railway Company and The New York Central Railroad Company, as respondents. The Attorney-General of the State of New York has appeared, under section 62 of the Executive Law. The petition alleges that the respondents have not complied with section 29 of the Public Service Law, which prohibits any change in rates without the prior approval of the State regulatory body. It has been conceded that such approval has not been obtained and that section 29 has not been complied with. The petitioners invoke the provisions of section 57 of the Public Service Law of the State of New York, which authorizes a proceeding in such case, and seek an injunction to restrain the respondents from carrying out their expressed purpose of raising, by ten per cent, passenger rates charged by them in intrastate traffic.

The respondents contend, however, that an order of the Interstate Commerce Commission, promulgated on the 21st day of January, 1942, permitting an increase of rates of ten per cent on the part of the petitioning Class I railroads applies to the intra-

state as well as to interstate rates of the respondents; and that as a result of this order, the respondents are obliged to increase their intrastate rates so as to make them accord with the authorized interstate rates without the necessity for further recourse to the Transit Commission. It is further argued that this court is without jurisdiction to pass upon the problems presented, ·inasmuch as exclusive right to deal with orders of the Interstate Commerce Commission of this character has been conferred by Congress upon the Federal District Courts. (U. S. Code, tit. 28, § 46; Judicial Code, § 208.)

There can be no question that if this proceeding involves to any extent an effort to " enjoin, set aside, annul, or suspend any order of the Interstate Commerce Commission " (§ 46), the only forum in which it might be heard in the first instance is the District Court of the United States. But, " The respondents' contention that only the United States courts have jurisdiction after the I. C. C. has made a determination (28 U. S. C. A., sec. 46) depends upon the prior finding of fact that the order of the I. C C. actually did affect intrastate rates in this State." (Mr. Justice ROSENMAN, on the application for a temporary injunction, N. Y. L. J. Feb. 11, 1942, p. 647.) Likewise, the refusal by Mr. Justice EDER (178 Misc. 175) to grant the application for removal to the Federal court recognized that as a preliminary to invoking section 46 of title 28 of the United States Code, it was necessary to determine whether an order of the Interstate Commerce Commission is being reviewed, or if, on the other hand, a statute of this State is sought to be enforced.

Indeed, the Supreme Court of the United States has indicated that a suit to enjoin the increase of intrastate rates on the ground that the increase is prohibited by State laws, may be maintained in the State courts, even when it is claimed *in the answer* that an order of the Interstate Commerce Commission requires the increase in question. (*American Express Co.* v. *South Dakota ex rel. Caldwell*, 244 U. S. 617, 628.) In upholding the jurisdiction of the State court, the court said: " If this were a proceeding professedly ' to enjoin, set aside, annul, or suspend ' an order of the Commission ' in whole or in part,' a State court would obviously have no jurisdiction. The bill does not purport to attack, nor does it even refer to, any such order. It alleges only that the express companies propose ' increases and advances ' in charges for intrastate transportation, by introducing ' existing interstate rates.' It is the answer which sets up the order of the Commission as a justification; and plaintiffs deny that it is such."

The argument of the respondents comes to this: That as a result of the history of the rate regulation of these respondents by the Interstate Commerce Commission, these respondents are required, under relevant orders of that Commission, to maintain their intrastate rates at the same level as the rates fixed by the Commission for interstate commerce; and that, in any event, reading the order of the Commission of January 21, 1942, in the context of the history of the rate regulation of these respondents, it is plain that the respondents are required to increase their rates on intrastate traffic by ten per cent. If this position were sound, it would follow that this court is without jurisdiction to deal with the matter and that the injunction must be denied. On the other hand, if an examination of the relevant matters manifest that there is no obligation on the respondents, by virtue of any order or orders of the Interstate Commerce Commission, to increase the respondents' intrastate rates at the present time, their power and right to do so would necessarily depend upon their first obtaining the approval of the State regulatory bodies (Pub. Serv. Law, § 29); and since, concededly, no such approval has in fact been obtained, it would follow that the injunction requested must issue.

Ever since *Houston & Texas R. Co.* v. *United States* (234 U. S. 342), it has not been open to doubt that Congress has the power to authorize the Interstate Commerce Commission to fix intrastate rates where such action is necessary to prevent interference with interstate commerce. In 1920, by a general amendment to the Interstate Commerce Act, Congress specifically authorized the Interstate Commerce Commission to fix intrastate rates whenever the Commission, " *after full hearings, finds* that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce." (Italics mine.) (U. S. Code, tit. 49, § 13, subd. [4].)

The power of the Interstate Commerce Commission in the premises, thus, cannot be brought in question; nor have the petitioners sought to do so. But the power of the Interstate Commerce Commission to regulate intrastate rates depends upon a *finding* by it that there exists an unfair discrimination against interstate commerce; and this determination must be *based on evidence* conforming to a high standard of certainty. (*Chicago & Northwestern R. Co.* v. *Rockwell Lime Co.*, 373 Ill. 309; 26 N. E. [2d] 99; certiorari denied, 311 U. S. 660.) In determining whether here, the orders of the Commission relied upon by the respondents,

actually purport to fix intrastate rates, it is appropriate to bear this rule in mind.

The history of the rate regulation of these respondents by the Interstate Commerce Commission since the Interstate Commerce Act of 1920 may be briefly recounted. On July 29, 1920, by an order — pursuant to section 15-a of the act, in a proceeding entitled *Ex Parte 74* (58 I. C. C. 220) — the Commission authorized a general increase of interstate passenger fares by twenty per cent. The New York State rate regulatory authority declined, however, to permit an increase of intrastate rates to conform with the increased interstate rate. A proceeding, initiated by the railroads before the Interstate Commerce Commission, pursuant to subdivisions 3 and 4 of section 13 of the Interstate Commerce Act, resulted in the determination by the Commission that the maintenance of the lower rate in intrastate commerce by the State of New York was an unfair discrimination against interstate commerce, and by order dated November 13, 1920, the respondents, among others, were directed " to cease and desist " from continuing the lower rate in intrastate commerce on the ground that such conduct would constitute unjust discrimination against interstate commerce. Though that order explicitly prevented the respondents from maintaining a lower rate in intrastate commerce than that directed for them in interstate commerce, nothing that has been called to my attention justifies the conclusion that either the report of the Interstate Commerce Commission in that proceeding or the order based upon it, established the general principle that intrastate rates must *always* conform with interstate rates. Indeed, it is exceedingly doubtful whether the Commission has power to adopt such a principle of construction and thus dispense with the need for a specific finding in each case that the maintenance of a lower intrastate rate unjustly discriminates against interstate commerce.

It is undoubtedly true, as was pointed out by the Supreme Court of the United States in *Wisconsin R. R. Comm.* v. *Chicago, B. & Q. R. R. Co.* (257 U. S. 563) that if the railroads are to earn a fixed net percentage of income, the lower the intrastate rates, the higher the interstate rates may have to be, and that the Transportation Act of 1920 may be said to have adopted the policy that the effective operation of the act " will reasonably and justly require that intrastate traffic should pay a fair proportionate share of the cost of maintaining an adequate railway system " (p. 586). *But this is far from saying that the intrastate rates and the interstate rates must be on a parity.* The problem of determining what is a fair proportion of the burden that should be borne by intrastate

traffic is one which the Interstate Commerce Commission is required to deal with, and its decisions must be based on findings that low rates for intrastate commerce would constitute an unfair burden on interstate commerce.

In 1936 the Commission amended its order by requiring a reduction in rates in interstate commerce. (214 I. C. C. 174.) The order, Exhibit I, specifically provided that in interstate commerce, rates be reduced to two cents per passenger mile in coaches and to three cents per passenger mile in Pullman trains. The report of the Commission, Exhibit H, upon which the order was based, does not discuss the problem of the relation between intrastate rates to interstate rates, nor does it determine that intrastate rates should be lowered as the result of this order. Indeed, it was assumed by at least one of the respondents here that the order of the Interstate Commerce Commission did not affect its right to maintain the higher rate and it was only after the petitioner initiated proceedings under section 57-a of the Railroad Law that the order of the courts of this State was obtained directing the respondent Long Island Railroad Company to reduce its rates to the level of the interstate railroad rates. (*Transit Commission* v. *Long Island R. R. Co.*, 272 N. Y. 27.)

Except for intermittent changes during periods of experiment, the 1936 order of the Interstate Commerce Commission remained substantially unchanged until the order of January 21, 1942.

This last order of the Commission resulted from a petition by the railroads, among them the respondents, for authority to increase their rates, fares and charges. The petition, Exhibit V, prays for an increase " of 10% in all fares," and also asks " that the cooperation of the State commissions be invited, as provided by law, in any investigation instituted and conducted by the Commission." The order, Exhibit M, provides " that the increased passenger fares as proposed by the said petitioners, be and they are hereby approved." No express statement that the intrastate rates shall be increased is contained in the order (nor so prayed for in the petition). Nor, upon careful analysis of its entire context, read in the light of its antecedent history, can such an inference be drawn from the provisions of the order modifying the prior orders " only to the extent necessary to permit the increase herein authorized; " nor from the fact that the order requires that it be filed in the dockets of the prior proceedings which considered intrastate rates.

The order of January 21, 1942, contains this provision: " It is further ordered, that all outstanding orders, as amended, of the Commission, authorizing or prescribing interstate and *intrastate*

*fares*, or bases of fares be, and they are hereby modified, effective concurrently with the establishment of the increased fares herein approved, only to the extent necessary to permit the increase herein authorized, to be added to the interstate and intrastate fares approved or prescribed in, or maintained or held by virtue of, said outstanding orders; * * *." This provision, standing altogether by itself, would lend strong support to the claim of the respondents that the Interstate Commerce Commission had intended to increase intrastate rates. Why amend orders dealing with intrastate rates, if there was no intention to deal with them? But the provision quoted must be read in the light of the entire order, its preambles as well as its directing provisions. Thus read, it becomes clear that the purpose of the quoted section of the order is merely to render possible action by the State regulatory bodies, to approve similar increases in intrastate rates. In its first preamble, the order refers to the fact " that proper authorities of all States have been notified of this proceeding and *similar* application has been or *will be* made to the regulatory authority of the respective States for *permission* to increase *similarly* petitioners' *intrastate* rate fares and charges." In the light of this recitation, it is obvious that in this aspect no more was intended by the order than to lift any restrictions that might exist barring applications to State regulatory bodies for permission to increase intrastate rates.

The respondents have sought to limit the preamble in the order of January 21, 1942, which recites that *similar* application will be made to State regulatory bodies for permission to increase intrastate rates, to rates for the transportation of milk and cream and rates charged for commutation fares. But the history of the rate regulation of these respondents by the Interstate Commerce Commission forbids such an interpretation. Exhibit R, which is the order of the Interstate Commerce Commission, entered on the 12th day of December, 1927, specifically vacated that portion of the order of November 13, 1920, in so far as it regulated rates for the transportation of " milk, cream, skim milk, butter milk, condensed milk, evaporated milk and pot cheese in intrastate commerce within the State of New York." The right of the State regulatory bodies, therefore, to fix intrastate rates with respect to these commodities from the date of that order was complete. At the same time, the order of the Interstate Commerce Commission of January 21, 1942, in *Ex Parte 148*, as we have seen, provided for an increase in rates " as proposed by the said petitioners." The petition, Exhibit V, specifically includes a proposal by the respondents here that " a uniform increase of 10% in all fares, including rates and charges for milk and cream

and articles grouped therewith" be permitted. It is apparent, therefore, that the order of the Interstate Commerce Commission, in *Ex Parte 148*, if held to apply to intrastate rates, would necessarily include rates on milk and cream, and the quoted preamble relied on by the petitioners here could hardly be given the limited scope which the respondents urge.

Again, with respect to commutation fares, the order of the Interstate Commerce Commission of the 13th of November, 1920, Exhibit F, expressly excluded commutation fares from the increase in intrastate rates there ordered. It was, therefore, not necessary to modify that order to permit State regulatory bodies to authorize an increase in commutation fares. Presumably, the Interstate Commerce Commission, *in 1920*, was of opinion that the maintenance of a lower rate for commutation fares did not work a discrimination against interstate commerce, and my attention has not been called to any finding by the Commission that any other conclusion was urged by them thereafter.

Finally, the argument limiting the scope of the preamble quoted loses sight of the two words " similar " and " similarly," used in the preamble. What the Interstate Commerce Commission envisaged by its order was a *similar* application to increase similarly petitioners' intrastate rates. To say that these words are limited only to rates for milk and cream and commutation fares would seem to distort the meaning of plain words by arbitrarily contracting their usual plenary significance.

Much has been said concerning the continued effectiveness of the order of the Interstate Commerce Commission in docket No. 11263, made November 13, 1920, Exhibit F. On the part of the respondents, it is argued that that order is still in force; and in effect requires the maintenance, until further order of the Interstate Commerce Commission, of intrastate rates on a level with interstate rates. Although disavowed in oral argument, the briefs submitted by the respondents frequently make the point that the effect of that order is to require intrastate rates to be maintained permanently at a level with interstate rates, or at least not be reduced below interstate rates. On page 9 of the respondents' reply brief they say: " The cumulative effect of the above is to establish that the thirteenth section order in docket number 11263 did not die in 1936, but remained in full force and effect as modified, for the purpose of establishing a minimum level for intrastate passenger fares within New York so as to prevent the discrimination which the Commission found would result from a level of intrastate fares within this State lower than interstate fares." This can only mean that the respondents contend that intrastate rates cannot

be reduced below interstate rates, regardless of what changes are ordered by the Interstate Commerce Commission in interstate rates, and in spite of continued complete silence, both as to findings and order, with respect to intrastate rates. But an examination of the order made by the Interstate Commerce Commission in docket No. 11263 reveals that it cannot be made to bear this burden. The order explicitly says that the railroads are directed " to cease and desist " from practicing the undue prejudice against interstate commerce there found and they are directed to establish rates in intrastate commerce comparable to rates then in effect under the order in *Ex Parte 74*. Taken literally, it would mean that the respondents are required to maintain their intrastate rates at the level fixed by the Commission for interstate rates in *Ex Parte 74*. But the rates fixed in *Ex Parte 74* have been several times amended by the Commission, the last amendment being authorized in *Ex Parte 148*, by the order of January 21, 1942. There is nothing, either in the order, Exhibit F in docket No. 11263, or in any subsequent order of the Interstate Commerce Commission which justifies the conclusion urged by the respondents that the intrastate rates of these respondents must be forever maintained at the level of the varying interstate rates authorized by the Commission from time to time. Had the Commission made such an order, it could not be for this court to question its power to do so. But if the view I entertain is sound, that the Commission would be without power to make such a blanket order for all time — that there is necessary a specific finding in each case or at least recurrently — that discrimination against interstate commerce required it, then it is clear that language more explicit and plain would be required to justify the conclusion that the Commission intended that result. I repeat, had the Commission made such an order, it would not be subject to review in this court; but I may not agree that the Interstate Commerce Commission would obliquely make an order under circumstances such as these, where its power to do so is open to serious question.

The practice adopted by the railroads in 1920 throws further light on this issue. There too, the order increasing railroad rates, in general language, was assumed by the railroad to apply to intrastate rates. But it was not until a separate proceeding was brought under subdivisions 3 and 4 of section 13 of the act, before the Interstate Commerce Commission, and an express finding of discrimination against interstate commerce was made that an order of the Commission was entered directly dealing with intrastate rates.

Upon the utmost that can be said for the position of the respondents, it remains that the scope of the order of the Interstate Commerce Commission of January 21, 1942, is in doubt. But I am enjoined to resolve such doubt in favor of the right of the State regulatory bodies. As the Supreme Court of Illinois said, in *Rockwell Lime Co.* v. *Commerce Commission* (373 Ill. 309, 319; 26 N. E. [2d] 99; certiorari denied, 311 U. S. 660): "Where a serious doubt obtains as to whether an order of the Federal Commission extends to intrastate rates, the doubt should be resolved in favor of the exercise of the State's power." (To the same effect, see the opinion of Mr. Justice BRANDEIS in *American Express Co.* v. *South Dakota ex rel. Caldwell, supra.*)

Where an order is ambiguous, reference may be had to the report of the Commission. (*Illinois Commerce Commission* v. *United States of America*, 292 U. S. 474; *Georgia Public Service Comm.* v. *United States of America*, 283 id. 765.)

The report upon which the order of January 21, 1942, is based was not before me on the trial, nor until after the final submission and exchange of briefs. It was issued on March 2, 1942. Now that it has been brought to my attention, I have studied it with care and it is to be deemed as part of the record.

Unfortunately there is nothing contained therein which tends to resolve the doubt engendered by the wording of the order itself. The intention or lack of intention to treat with intrastate rates is still obscure, as the report employs the same form of expression found in the order of the Commission without further explanatory reference.

I must conclude that under the circumstances of this proceeding, it is impossible to hold that there exists any explicit requirement of the Interstate Commerce Commission that the intrastate passenger rates of these respondents must conform to the interstate rates authorized by the order of January 21, 1942, or that the order of January 21, 1942, in any way directs the respondents to increase their passenger rates by ten per cent in intrastate commerce.

Except only where intrastate rates fixed by State authorities have been found to interfere unduly with interstate commerce, the prerogatives of the State in regulating railroad rates are not subject to interference by Congressional action nor to any powers delegated to the Interstate Commerce Commission. The maintenance of a sound railroad system is of vital concern to the people of the State of New York, and that this can be achieved only through the careful supervision of the railroads by a governmental agency conversant with the problems and charged with the high

duty of alert and circumspect regulation is a lesson which the last fifty years have taught to the American public at no inconsiderable cost. This is not to doubt either the wisdom or necessity of similar supervision in interstate commerce by Federal agencies, nor to fail to realize that where a clear conflict exists between State and Federal regulation, the latter must prevail. (*Pennsylvania Railroad Co.* v. *Illinois Brick Co.*, 297 U. S. 447.) Only the other day the Supreme Court of the United States, speaking through the Chief Justice, said: " The power of Congress over interstate commerce is plenary and complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution (*Gibbons* v. *Ogden*, 9 Wheat. 1, 196). It follows that no form of State activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress. Hence the reach of that power extends to these *intrastate* activities which in a substantial way interfere with or obstruct the exercise of the granted power." (*United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110.)

While these principles are firmly fixed in the framework of our constitutional law, here neither Congress nor the Interstate Commerce Commission has spoken. The maintenance of the dignity and importance of State regulatory bodies requires that their powers and functions be safeguarded by the courts, and that their authority, where it exists, be fully enforced. The remedies which the respondents have are by appeal directly to the Interstate Commerce Commission itself. " The appropriate remedy," said Mr. Justice BRANDEIS, " under such circumstances is an application to the Commission requesting it to suspend the operation of the order insofar as it may affect the isolated cases; and, if necessary, to enter an independent order dealing specifically with them." (*Georgia Public Service Comm.* v. *United States of America, supra*, 772.)

Presumably, either side to this proceeding is at liberty to apply to the Interstate Commerce Commission for a clarification of its orders. A further order of the Interstate Commerce Commission might very well be entered either explicitly asserting that the matter of intrastate rates in the State of New York has been left to our State regulatory bodies or directing that they be increased to a parity with interstate rates. The decree to be entered herein, therefore, will provide that either party may, at the foot thereof, apply for an order amending the decree modifying the injunction to be granted herein, in part, or vacating it in its entirety.

This proceeding, as I have earlier pointed out, has been brought under the authorization contained in section 57 of the Public

Service Law. There, the court is enjoined that " the final judgment in any such action or proceeding shall either dismiss the action or proceeding or direct that a writ of mandamus or an injunction or both issue as prayed for in the petition or in such *modified or other form as the court may determine will afford appropriate relief.*" (Italics mine.)

Accordingly, a decree will be entered making the temporary injunction permanent; but providing that either side may apply at the foot of the order for a modification thereof or to vacate the same upon the presentation of further clarifying orders of the Interstate Commerce Commission.

Findings of fact and conclusions of law having been sufficiently indicated in this opinion, they are hereby dispensed with.

Settle decree on three days' notice.